CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

SEP 2 9 2006

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

| | |
|---|---|
| CENTENNIAL BROADCASTING, LLC, | CIVIL ACTION NO. 6:06-CV-00006 |
| *Plaintiff,* | |
| v. | OPINION AND ORDER |
| GARY E. BURNS | |
| and | JUDGE NORMAN K. MOON |
| 3 DAUGHTERS MEDIA, INC., | |
| *Defendants.* | |

This matter is before the Court on the August 4, 2006 motion of Plaintiff Centennial Broadcasting LLC ("Centennial") to make the preliminary injunction entered on March 20, 2006, permanent. Plaintiff has also moved the Court pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure to consolidate the permanent injunction merits with (i) the evidence taken at the March 13, 2006 preliminary injunction hearing; (ii) the deposition testimony of Defendants' expert Michael Harrison, taken on June 14, 2006; and (iii) the deposition testimony of Centennial's rebuttal expert, Walter Sabo, taken on July 21, 2006.

## I. Procedural Background

On February 17, 2006, Centennial brought this diversity action seeking permanent injunctive relief and damages arising out of the alleged violation by Defendant Gary Burns

1

("Burns") of a non-compete agreement that he entered into in connection with his sale of radio

station WLNI-FM ("WLNI") to Centennial. Centennial also sought a preliminary injunction

ordering Defendants to cease using a "talk" programming format on WBLT-AM ("WBLT"), a

station owned by Defendant 3 Daughters Media ("3 Daughters") and controlled by Burns.

After considering the parties' briefs on the merits of the preliminary injunction, the Court

determined that the issues presented were narrow and that consolidation of the trial on the merits

with the preliminary injunction hearing pursuant to Rule 65(a)(2) might be appropriate. The

Court notified the parties orally and in writing a week prior to the March 13, 2006 hearing to be

prepared for a consolidated hearing.[1] However, because it had been rescheduled on short notice,

the Court agreed to permit Defendants to submit the deposition testimony of a media expert

unavailable on the rescheduled hearing date, and Centennial to offer rebuttal testimony, after the

preliminary injunction hearing and before the Court made a final decision on the permanent

injunction merits.

The parties presented affidavits and documentary evidence prior to the hearing, at which

both Burns and the president and CEO of Centennial, Allen Shaw ("Shaw"), testified. Applying

the four traditional factors set forth in *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig

Manuf. Co., Inc.*,[2] the Court granted Centennial's motion for a preliminary injunction, prohibiting

Defendants from further use of nationally syndicated or local talk radio[3] shows on WBLT during

---

[1] *See* P. Mot. Disc., docket no. 32, Exh. A (May 10, 2006).

[2] 550 F.2d 189 (4th Cir. 1977).

[3] The Court defined the "talk" show format as consisting of "shows that feature[] regular
hosts, including nationally syndicated or local personalities, who devote blocks of time to
commentary, often interspersed with conversation with guests or listeners." *Prel. Inj. Opinion*,

2

the pendency of the action or until further order of the Court. Op., docket no. 23, at 5-6 (March 20, 2006).

The parties subsequently moved the Court to modify its standard pretrial scheduling order and to clarify the effect on discovery of the Court's notice of intent to consolidate. By order of May 19, 2006, the Court set a schedule for the deposition of expert witnesses and the filing of briefs on the permanent injunction merits, and notified the parties that it would consider only (i) the testimony and submissions offered in connection with the preliminary injunction hearing, (ii) the deposition testimony of Defendants' designated media expert, and (iii) the deposition testimony of Centennial's rebuttal media expert. *O&O Modif. PTO*, docket no. 39, at 4 (May 19, 2006). The Court further explained:

> If after consideration of this evidence the Court is satisfied that the [non-compete agreement's] language . . . is unambiguous, it will decide the merits of Plaintiff's request for a permanent injunction. If, however, the Court determines that disposition of the merits requires further development of the record, it will permit the parties to conduct further discovery.

*Id.* (footnotes omitted).

On May 3, 2006, Defendants moved to dissolve the preliminary injunction, arguing that a Federal Communications Commission ("FCC") decision issued three days after its entry required that it be dissolved; that the non-compete agreement is unenforceable because it is vague and contrary to public policy; that enforcement of the non-compete agreement violates their First Amendment rights; and that the injunction is vague and thus does not comply with the requirements of Rule 65(d). The Court denied the motion, addressing only the first and last arguments because the Defendants never raised the First Amendment argument at the preliminary

---

docket no. 23, ¶7 (March 20, 2006).

3

injunction stage, and because they offered no new law or facts to support the public policy argument, which had already been rejected by the Court.[4]

## II. Summary of the Evidence

On February 28, 2005, Burns sold radio station WLNI to Centennial for approximately $4.4 million. *Verif. Compl.* ¶13; *Answer* ¶13. Among the assets Burns agreed to transfer for this consideration were all licenses, permits, and authorizations issued by the FCC for the operation of the station, all of Burns's goodwill in the business, and its going concern value. *Id.* ¶8; *Id.* ¶8. Of the purchase price, $180,000 was paid for studio equipment, $50,000 for antenna and tower equipment, $35,000 for miscellaneous office furniture, and $4.135 million for "the goodwill, the licenses, . . . basically the business . . . the cash flow." *Tr.* at 26 (March 13, 2006)

As a condition of the sale, on February 28, 2005, Burns entered into a Non-solicitation and Consulting Agreement with Centennial for which he received $25,000 of additional consideration. *Verif. Compl.* ¶¶9, 15, 23; *Answer* ¶¶9, 15, 23. Numbered paragraph 2 prohibits Burns, acting directly or through a corporation or other business controlled by him, from operating a commercial radio station for a period of five years in the Roanoke-Lynchburg Arbitron Metro radio market "if such station utilizes a programming format substantially similar to" that used by WLNI on the date Burns transferred WLNI to Centennial (the "non-compete agreement").[5] *Id.* ¶9, Exh. A; *Id.* This non-compete agreement represents a compromise

---

[4] In a footnote, the Court added: "Because the Court informed the parties prior to the March 13, 2006 hearing of the possibility of consolidation under Rule 65(a)(2), the Court will not consider Defendants' First Amendment argument...in deciding the merits of the permanent injunction." *Op.*, docket no. 39, at 10 n.10 (June 8, 2006).

[5] Numbered paragraph 5 of the Non-solicitation and Consulting Agreement provides:

4

between Burns, who wished to continue in the radio business in his home area, and Centennial, which had originally proposed a non-compete prohibiting Burns from owning any radio stations in the area. *Burns Affid.*, ¶3.

On February 28, 2005, WLNI utilized a talk programming format, which Burns has specifically described as an "All Talk" format. *Id.* ¶19; *Id.* ¶19; *Burns Affid.* ¶11. More specifically, it aired 24 hours of talk radio shows involving the following subject categories: fifteen hours of General Issues/Political Talk;[6] a one-hour Health Talk show; a two-hour talk show involving consumer issues; a two-hour Sports Talk program; and a four-hour "Hot Talk" show. *Expert Report of Michael Harrison*, Exh. C ("*Harrison Report*"); *Harrison Depo.* at 31-33, 40, 45-46; *Williams Affid.*, docket no. 67 ¶¶3-7 (Sept. 5, 2006).

"Arbitron" is a national radio audience measurement company that defines the "Roanoke-Lynchburg" market as encompassing the cities of Roanoke, Lynchburg, Bedford, and Salem, and six Virginia counties: Roanoke, Boutetourt, Bedford, Campbell, Amherst and Appomattox. *Verif. Compl.* ¶¶17-18; *Answer* ¶¶17-18. To measure the market share of radio

---

The parties to this Agreement acknowledge that the injury to the Buyer resulting from any violation by the Covenantor of the covenants herein will be irreparable and of such a character that it cannot be compensated by money damages, that the remedy at law of any such violation will be inadequate, and that the damages resulting from any such violation are not readily susceptible to being measured on monetary terms . . . . Covenantor shall not object to, and shall be deemed to join in Buyer's petition that bond or other security be waived in connection with any such restraining order or injunctive relief . . . .

*Verif. Compl.* Exh. A.

[6] This 15 hours includes the following shows and time periods: 6:00 A.M. - 9:00 A.M. (The Morning Line (local)); 10:00 A.M. - 1:00 P.M. (Neal Boortz (syndicated)); 3:00 P.M. - 5:00 P.M. (Sean Hannity (syndicated)); 7:00 P.M. - 10:00 P.M. (Michael Savage (syndicated)); 2:00 A.M. - 6:00 A.M. (Jim Bohannon (syndicated)).

5

stations, Arbitron relies on biannual fall and spring "sweeps," during which it collects diaries from radio listeners who record the stations they listen to and the amount of time spent listening to each station. *Tr.* at 36-37 (March 13, 2006).

On or about November 1, 2005, 3 Daughters Media, Inc., which is controlled by Burns, purchased WBLT-AM ("WBLT"), a station licensed by the FCC to Bedford, Virginia. *Verif. Compl.* ¶24; *Answer* ¶24. WBLT is a commercial radio station that broadcasts in the Roanoke-Lynchburg Arbitron market. *Id.* ¶25; *Id.* ¶25. Burns admits that he started airing talk shows soon after buying WBLT, but described WBLT as having a "variety" format because he also intended to air local news, sports, town meetings, community information, church services, and music. *Tr.* at 77-78, 104-05 (March 13, 2006); *Burns Affid.* ¶14.

Shaw, Centennial's president and CEO, listened to WBLT for 24 hours starting 5 a.m. on February 8, 2006. *Shaw Affid.*, ¶17. Shaw's hour by hour record reveals that it aired syndicated talk programs for 20.5 hours, a half hour "news and commentary" segment, and 3 hours of oldies music from 3 p.m. to 6 p.m. *Id.* Shaw's record is largely consistent with the "Program Schedule" Defendants provided their expert media witness, except that the half hour of news and commentary was replaced by more syndicated talk, and the 6 p.m.-9 p.m. slot is listed as "Local Sports or Public Affairs (approx. 1/3 of year, otherwise repeat Laura Ingraham)." *Harrison Report*, Exh. C ("WBLT and WLNI Schedules"). Laura Ingraham is a syndicated talk show host. *Id.*

Shaw learned about WBLT and, believing Burns to be in violation of the non-compete agreement, questioned him and received a reply in a December 14, 2005 email:

[Shaw:] If a talk program run on WBLT is not "substantially similar to any format used by

6

the Station (WLNI)" then what kind of programming would be considered substantially similar [sic]
[Burns:] Perhaps we should have this fight early . . . [A]ny talk programming that is not the same is substantially different, in fact. Mark Davis and Clark Howard are substantially different as is [sic] Tom Leykis and Rusty Humphry.

*Shaw Affid.* ¶¶16, Exh. 4.

Before the preliminary injunction issued, WBLT earned no revenue from advertising or

any other source. *Tr.* at 87 (March 13, 2006).

### i. Centennial's evidence on the meaning of "programming format" in the radio industry and its application to WBLT and WLNI

Charles Shaw has 47 years of experience in the commercial radio industry. *Tr.* at 12

(March 13, 2006). After majoring in radio and television in college, he worked for and

ultimately became president of FM stations at ABC Radio in New York; worked as executive

vice-president and COO of two North Carolina based communications companies that owned

numerous stations in various markets; created and sold his own communication company; served

as vice-chairman of the board and co-COO of a broadcasting company that operates 44 radio

stations in 10 cities; and, most recently, started Centennial, which owns 4 stations in the Roanoke

area. *Id.* at 12-14.

Shaw opined that WLNI had a "Talk" programming format on February 28, 2005, and

defined this format as follows:

[It] consists primarily of blocks (1 to 4 hours) of conversation and commentary by a radio "Talk Show Host(s)." These hosts may originate nationally . . . or they may originate locally at the radio station. The typical content of such shows is comprised of the host talking about a variety of subjects including politics, sports, entertainment, psychology, money, etc. The host may have in-studio guests and may take telephone calls from listeners.

*Shaw Affid.* ¶¶3-4.

7

Shaw testified that Radio & Records ("R&R") is the leading magazine (the "bible") of the radio industry, and that its coverage includes "programming and sales and almost all aspects of the radio and record industry." *Tr.* at 15 (March 13, 2006). R&R publishes a page called "National Format Shares." This page lists the overall market shares of 15 radio formats, including 13 music formats, one designated as "Religious," and the last called "News/Talk/Sports." *Id.* at 16.[7] R&R breaks down News/Talk/Sports into four so-called "subformats," which include News/Talk, News, Sports, and Talk. *Id.* at 1 /-18. Shaw explained that the News/Talk subformat would describe a "talk station that does a lot of news and perhaps a lot of the talk programming revolves around current news items"; the News subformat would describe a station "that does either primarily or totally all news broadcasts, news reporting"; Sports would be either "a station that carries Play-by-Play or a combination of Play-by-Play and sports talk"; and Talk would be a station that may do some five-minute newscasts perhaps once an hour or "a few other things," but airs long-form talk most of the time. *Id.*

After listening to WBLT for 24 consecutive hours on February 8-9, 2006, Shaw testified that it aired 21 hours of "syndicated long-form talk programming," and 3 hours of music. Tr. at 32-33 (March 13, 2006); *see also Shaw Affid.*, ¶17. He concluded that WBLT had "identically the same format" as WLNI. *Id.* at 33.

Centennial also offered Walter Sabo ("Sabo") as a rebuttal expert witness. Sabo has been in the radio industry for approximately 38 years, serving as ABC radio network's vice president when it was the largest radio entity in the world, as an independent consultant for

---

[7] Burns submitted R&R's Spring 2005 National Format Shares as an attachment to his affidavit. *Burns Affid.* Exh. C.

8

numerous radio companies, and presently as CEO of Sabo Media, a media programming, marketing, and management company that he founded. *Sabo Depo.* at 6; *Expert Report of Walter Sabo* at 1-2 ("*Sabo Report*"). Sabo discovered a number of talk radio's best known personalities and contributes regularly to Talkers magazine. *Sabo Report* at 2.

In Sabo's opinion, while talk radio has evolved since 1987 into more than one format,[8] "the formats utilized by WLBT [sic] in Bedford, Virginia, and WLNI in Lynchburg, Virginia are and remain substantially similar in appeal despite this evolvement." *Sabo Report* at 2-3. Although not identical in content, both stations' programming "is designed for an older adult male audience," would directly compete for the same audience, and, "[a]ccordingly, the formats for the two stations must be considered substantially similar." *Id.* at 3.

During his July 21, 2006 deposition, Sabo elaborated that a radio station's programming format is determined by its structure and content as analyzed over a 24-hour period, and that WBLT and WLNI have substantially similarly formats "because the bulk of what the hosts of both stations talk about . . . is in a similar topic group, and they are scheduled in a way that makes them similar." *Sabo Depo*, 8-10, 28-29, 82. He noted that the "majority" of the programs on WLNI and WBLT "are based on current events and politics" and that their structure is similar because both use "block programming"—airing discrete shows in which hosts choose topics and production music, set the pace, and manage phone calls. *Id.* at 8-9, 24-25, 40.

### ii. Defendants' evidence on the meaning of "programming format" in the radio industry

---

[8] During his deposition, Sabo testified that the different talk formats include "[a]ll news, all sports, political general talk, which is a majority of the stations, targeted talk, and news talk," and that "[t]here are probably more." *Sabo Depo*. at 34.

9

***and its application to WBLT and WLNI***

Gary Burns has worked in the radio industry for the last 37 years, working with on-air

talent, in sales, sales management, group management, and later as a consultant for the largest

media consulting company in the United States, and as a radio station owner in small and large

markets. *Tr.* at 61-62 (March 13, 2006); *Burns Affid* ¶10. Throughout his career, Burns has

specialized in talk radio. *Id.*; *Id.* He bought WLNI in 1997 and has owned four talk radio

stations. *Tr.* at 62 (March 13, 2006).

Based on this experience, Burns opined:

> [T]here are various dissimilar varieties of radio programming that involve the spoken word
> and talk shows and these varieties are recognized as distinct in the radio business. "All Talk"
> radio is a **format** with a primary emphasis on talk radio programs, de-emphasizing news, and
> dealing with topical events. "News Talk" radio is a **format** with a primary emphasis on talk
> radio programs, emphasizing news, and dealing with topical events. "All Talk" and "News
> Talk" are recognized as distinct **categories** . . . . "Variety" radio is a format dating back at
> least to the 1950s combining a number of different types of radio formats offered as one
> format, using different aspects of what are now recognized as distinct formats . . . It is
> recognized in the radio industry that the subject matter of programming impacts its format
> categorization. For example, religious programming is not categorized as "News",
> "News/Talk"; or "Talk." See Exhibit C[9] . . . . As explained in the latest issue of Talkers
> Magazine, the Talk radio format has evolved into at least 9 **categories** of Talk, including
> General Issues/Political Talk, Sports Talk, Hot Talk, Popular Culture Talk, Financial Talk,
> Home Talk, Health Talk, Psychology/Relationship Talk, and Specialty Talk . . . .

> At the time of the Asset Purchase Agreement and the closing of the sale of WLNI-FM to
> Centennial, **WLNI-FM utilized an All Talk format**.[10]

_____

[9] Exhibit C is Radio and Record magazine's "National Format Shares."

[10] Burns contrasted All Talk with News/Talk stations, which are defined at
http://www.radiotalk.org/stations.html. *Burns Affid.*, ¶10, Exh. A. Radiotalk.org defines All
Talk as " 'all talk, all the time.' While most will have very fine news departments, news is not
the most important thing. Programs may cover a wide range of subjects." *Id.*, Exh. A.
        "News/Talk" stations, by contrast, "aim for more of a balance between news coverage
and call-in talk shows. This balance may shift as major news stories break in and then fade." *Id.*
        Radiotalk.org defines three other talk formats, including Full Service, Sports, and

*Burns Affid.* ¶¶10-11 (emphasis added).

Burns admitted at the hearing that the nine different "categories" distinguished in *Talkers* magazine fall under the scope of R&R's "generally accepted" News/Talk/Sports "classification," but explained that between them, they "are not similar, not even vaguely similar." *Tr.* at 86-87 (March 13, 2006). Burns also conceded that "the bulk" of WBLT's programming, at least Monday through Friday, was syndicated talk shows, but stated that he believed he had not violated the non-compete agreement because WLNI and WBLT aired different shows drawing from the nine "genres" of talk. *Id.* at 100-01, 117, 122.

Defendants designated Michael Harrison ("Harrison") as a media expert. Harrison is the founder, editor and publisher of *Talkers* magazine, the leading publication of the talk radio industry in the U.S. *Talkers* also operates a leading industry website and sponsors an annual seminar for the industry. *Harrison Report* at 1-2. He started his career in broadcasting in 1967, and has served as program director at numerous big-city stations, was an on-air personality on several stations, owned a station in Springfield, Massachusetts, and has other managerial and editorial trade magazine experience. *Id.* at 2. He is widely recognized as a leading authority on the talk radio industry, appears frequently in the press discussing matters related to talk radio,

---

Specialized talk radio. *Id.* Full Service is defined as follows:

> While the programming on these stations is primarily talk, it covers a wide variety of topics. In addition, they will carry sports events and special events such as air shows. There may be more of an emphasis on public affairs and community based programming. A host may even play a record now and then, but not very many or very often.

*Id.* A Specialized talk station "may focus on all politically oriented talk shows" and are characterized by their choice of "very individual niches." *Id.* A Sports talk format includes talk "about local and national sports stories" and carry "professional, college, and even high school sporting events."

11

and is a regular contributor on a number of nationally syndicated radio shows. *Id.*

In Harrison's opinion, WLNI and WBLT do not have substantially similar programming formats. *Harrison Report* at 3, 5. In his view, "there is no distinction between a radio 'format' and a radio 'genre'" in the business, and "currently there are nine leading talk radio genres/formats." *Id.* at 3. These are the same nine listed in paragraph 10 of Burns' affidavit[11] and were described in a February 2006 article in *Talkers* that Harrison authored. *Id.* at 3-4, Exh. B. The *Talkers* article explains that "[w]e have broken down on-air talent to nine major categories" and describes the "General Issues/Political Talk" category as "[t]he most-programmed form of talk radio featuring conservatives, liberals, moderates and generalists." *Id.*

Contrary to Sabo's view that a radio station's "programming format" must be judged in terms of content and structure over a typical 24-hour day, and that the similarity two stations' formats requires comparison of these variables, Harrison testified that the similarity of two stations must be judged by comparing program subject matter, and a program's origin as either local or nationally syndicated, on a minute-by-minute basis throughout the day—with particular emphasis place on similarity at "peak" listening times. *Harrison Depo.* 34-36. Because of his emphasis on subject matter, Harrison specifically rejected the definition of "programming format" adopted by the Court, which emphasized only structural talk show features of regular hosts who talk for blocks of time, often joined by guests and call-in listeners.[12] *Id.* at 26-27.

In Harrison's view, WBLT has a "pure news talk format" because "a majority of the time is news talk." *Harrison Depo.* at 43. Despite straying from the General Issues/Political Talk

---

[11] *Supra* at 10.

[12] *See supra* at fn. 3.

Case 6:06-cv-00006-NKM-mfu   Document 73   Filed 09/29/06   Page 12 of 23   Pageid#: 646

terminology of his *Talkers* article, Harrison clarified on cross that "[g]eneral issues, political talk and news talk are basically one and the same." *Id.* at 48. WLNI's format, by contrast, could not be defined because it has "elements of news talk, elements of sports talk, elements of hot talk"—it is a "hodge podge." *Id.* at 44-45. On cross-examination, Harrison admitted that of his nine talk categories, four regular WLNI shows—totaling 12 hours per day—fall into the General Issues/Political Talk category, and that six, and possibly seven,[13] regular WBLT programs, totaling 18 or 21 hours per day, are also General Issues/Political Talk shows. *Harrison Depo.* at 31-33, 40, 45-46, 48. He had no evidence before him as to the nature or contents of WLNI's 6 a.m. - 9 a.m. show, "The Morning Line," other than that it was local.[14] *Id.* at 40. Asked on cross whether the significant number of hours of General Issues/Political Talk syndicated shows on WBLT and WLNI meant that they had the same format, Harrison stated, "I could see where you would think that, and it all depends on actually analyzing the actual number of hours that they do the different shows. It is possible, but I haven't analyzed that . . . ." *Id.* at 48-49.

### III. Findings of Fact

1.    Allen Shaw believes that WLNI and WBLT use an identical "Talk" programming format.

2.    Gary Burns believes that WBLT has a "Variety" format, including some elements of talk alongside local news, sports, town meetings, community information, church services, and music.

---

[13] Harrison characterized "Good Day USA," which WBLT airs from 6 a.m. to 9 a.m., as a "hybrid" of news and "lifestyles." *Id.* at 40.

[14] On September 5, 2006, at the invitation of the Court, Centennial submitted affidavits demonstrating that The Morning Line was on February 28, 2005, and continues to be, a General Issues/Political Talk program. *Williams Affid.*, docket no. 67 ¶¶3-7 (Sept. 5, 2006); *Weigand Affid*, docket no. 68 ¶3 (Sept. 5, 2006).

13

3. Burns' definition of "Variety" is inconsistent with WBLT's programming schedule, which according to Burns includes at minimum, 18 hours of syndicated talk radio per day plus another 3 hours per day two-thirds of the year. His unrealized, hypothetical plans to promote WBLT as a Variety station are irrelevant.

4. Burns offered no coherent opinion on the "programming format" used by WLNI. In paragraph 11 of his affidavit, he states that WLNI has an "All Talk" format. This opinion is irreconcilable with his later position that a talk radio station must be evaluated in terms of nine subject matter "categories."

5. "Programming" is distinct from "programming *format*." As an example, Rush Limbaugh and Sean Hannity are distinct programs which share the same programming format.

6. Burns' understanding of the term "programming format" can be inferred from his clear statement that WLNI has an "All Talk" format, apparently based on the Radiotalk.org definition attached to his affidavit. Thus, it may be inferred that Burns accepts Radiotalk.org's breakdown of talk programming formats into All Talk, News/Talk, Full Service, Specialized, and Sports

7. Using Radiotalk.org's definition, Burns correctly stated that WLNI has an All Talk format.

8. Again relying on Radiotalk.org, WBLT uses either an All Talk or a Full Service format.

9. Two stations that both utilize All Talk formats would have the same formats.

10. Based on Radiotalk.org's definitions, *supra* n.10, All Talk and Full Service Talk are substantially similar formats, and, thus, WBLT either has the same or a substantially format as WLNI. This is true because "Full Service" stations feature "primarily" talk with some music, sports events, special events, and/or community-based programming.[15]

11. Plaintiff's expert Walter Sabo believes that WLNI and WBLT have identical formats because both use block programming and air talk shows with current events and politics subject matters for the majority of a 24-hour day.

12. Sabo's method of evaluating a station's programming format is irreconcilable with the Court's and Shaw's purely structural approach. He recognizes the importance of the content and structure of programming over a 24-hour period, and believes that the talk

---

[15] A News/Talk station airs a mixture of news and talk shows; this format is substantially similar to those of WLNI and WBLT. A "Specialized Talk" station would have a format substantially similar to those of WLNI and WBLT if its talk shows focused on current events and/or politics.

14

radio has evolved into separate formats, including but not limited to all news, all sports, political general talk, targeted talk, and news talk.

13. Using Sabo's terminology, both WBLT and WLNI have a political general talk programming format.

14. Defendant's expert Michael Harrison's method of evaluating a station's programming format is not reconcilable with any of the previously discussed approaches, as it is concerned primarily with subject matter and requires minute-by-minute comparison

15. Harrison he did not actually count the number of hours that each station aired talk shows falling within the same of the nine subject-matter categories, either on a 24-hour or minute-by-minute basis. Thus, his opinion was not formed based on the methodology he described and lacks the necessary basis to be considered relevant

16. Using Harrison's approach, both WLNI and WBLT use a General Issues/Political Talk programming format, because each airs talk shows with current events and politics subject matters for a majority of the time and with significant hour-by-hour overlap.

17. Burns admits that he freely entered into the non-compete agreement.

18. Of the $4.4 million sale price of WLNI, Burns received over $4 million for its goodwill.

19. WLNI and WBLT directly compete for listeners within the Roanoke-Lynchburg Arbitron market.

20. All other things being equal, advertising revenue is likely to rise as the number of listeners and market share increases and fall as the number of listeners and market share decreases.

21. It is impracticable, if not impossible, for WLNI to measure the decline in listeners, market share, and advertising revenues caused by WBLT's competition.

## IV. Conclusions of Law

### A. Subject matter jurisdiction is proper.

At the September 15, 2006 hearing, Defendants questioned this Court's subject matter jurisdiction, pointing out that the non-compete agreement had only cost Centennial $25,000, while diversity jurisdiction requires that in excess of $75,000 be at stake. 28 U.S.C. § 1332.

15

The plaintiffs alleged in their complaint that they had suffered damages exceeding $75,000. Jurisdiction thus attached at filing and cannot be ousted by later events. "[T]he sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938). A subsequent reduction of the plaintiff's demand will not oust jurisdiction. *Id.* Even if Plaintiffs receive no monetary recovery at all, jurisdiction is still proper. *See Scott v. Donald*, 165 U.S. 58, 89-90 (1897).

Defendant's argument that the only "amount in controversy" is the price of the non-compete agreement is without merit. That agreement was ancillary to, and protective of, a much larger agreement. Mr. Burns received over $4 million for the goodwill of his business; destruction of less than 2% of that value by competition in violation of the agreement would clear the jurisdictional threshold.

**B. The non-compete agreement is enforceable under state law**

In determining the enforceability of a covenant not to compete, courts regularly distinguish between the employer/employee context and the vendor/buyer sale of business context. *Richardson v. Paxton Co.*, 127 S.E.2d 113, 117 (Va. 1962); *Alston Studios, Inc. v. Lloyd v. Gress and Assoc.*, 492 F.2d 279, 284 (4th Cir. 1974); *Roto-Die Co. v. Lesser*, 899 F. Supp. 1515, 1519 (W.D. Va. 1995); *see generally* C. T. Dreschler, Annotation, *Enforceability of covenant against competition, ancillary to sale or other transfer of business, practice, or property, as affected by duration of restriction*, 45 A.L.R.2d 77 (1956). The scope of permissible and enforceable restraints "is more limited between employer and employee than between seller

16

and buyer." *Richardson*, 127 S.E.2d at117. This difference in standards is justified by the fact that "employees often have comparatively little bargaining power and less leverage for negotiating a fair deal," while the sale of a business "more typically involves sophisticated parties coming to an agreement after an arms-length negotiation process." *Western Insulation, L.P. v. Moore*, 2006 WL 208590 *5 (E.D. Va. 2006) (unpublished). Restrictions on an employee's "means of procuring a livelihood for himself and his family" are more likely to threaten public policy interests than restrictions on a seller, "who usually receives ample consideration for the sale of the good will of his business." Dreschler, Annotation at §4[c].

A covenant not to compete that is limited as to area and duration, and as to the scope of restricted activities, so as to reasonably protect the promisee's business, is enforceable. *Worrie v. Boze*, 62 S.E.2d 876, 881 (Va. 1951). Virginia courts will enforce five-year restrictive covenants limited in geographic scope and in terms of activities prohibited in the context of professional partners leaving a partnership and the sale of a business. *See Meissel v. Finley*, 95 S.E.2d 186 (Va. 1956); *Stoneman v Wilson*, 192 S.E. 816 (Va. 1937); *Harris v. McGladrey & Pullen*, not reported in S.E.2d, 1989 WL 646380 (Va. Cir. Ct. 1989).

The non-compete agreement at issue clearly qualifies for the relaxed standards that apply in the sale of business context, and is enforceable under Virginia law. Burns negotiated the agreement at arms-length as part of the sale WLNI, receiving, by his own admission, over $4 million in goodwill, $25,000 in additional consideration, and a concession from Centennial limiting the scope of his restricted activities only to control of stations utilizing a format substantially similar to WLNI's. Its five-year duration and limitation to the Roanoke-Lynchburg market in which WLNI competes further supports the conclusion that it is reasonably calculated

to protect Centennial's business interests, and, thus, is enforceable.

## C. FCC policy does not preempt the non-compete agreement.

Defendants Burns and 3 Daughters have repeatedly asserted that the covenant not to compete violates the Communications Act and FCC regulations and is therefore preempted under the Supremacy Clause. The Court has considered and rejected this argument once already, and does so again now. It is certainly true that the FCC does not regulate radio formats, preferring to leave that decision to the licensee and the free market. *FCC v. WNCN Listener's Guild*, 450 U.S. 582 (1981). It is also true that the FCC will not approve license applications or transfers when the new licensee's ability to operate a station or select programming is unduly inhibited by contractual terms, and will make removal of those terms a condition of approval. *Cumulus Licensing LLC*, 21 FCC Rcd 2998 (2006). Defendant has not, however, cited any cases for the proposition that FCC rules and decisions governing license transfers and applications–which are FCC actions–alter state contract law or are mandatory on courts. In *In Re Roman*, the FCC took quite the opposite position, stating, "Congress has not preempted the field of contracts relating to broadcasting [and] there is no conflict between State and Federal policy as to the covenant not to compete..."[16] Indeed it is precisely because such terms are valid that the FCC requires that they be deleted from contracts to prevent them from interfering with the "public interest" as the FCC understands it. If such terms were preempted and therefore unenforceable, there would be no need to delete them.

According to Defendants, the FCC was not informed of the agreement in Burns' license application for WBLT(AM), and thus had no opportunity to pass on its appropriateness, or to

---

[16]38 FCC 290 (1965)

18

demand the restriction be modified as a condition of license approval. *Def.'s Mem. Opp'n Mot. Perm. Inj.* At 8, docket no. 57 (August 18, 2006). Any conflict between his duties as a licensee and his contractual obligations is of his own making and does not merit relief from the Court.

**D. The meaning of "programming format" is unambiguous as used in this contract, as is the meaning of "substantially similar."**

When the terms of a contract are clear and unambiguous, the interpretation of those terms presents a question of law. *Musselman v. Glass Works, L.L.C.*, 533 S.E.2d 919, 921 (Va. 2000); *Pollard & Bagby, Inc. v. Pierce Arrow*, L.L.C., 521 S.E.2d 761, 763 (1999). *Whether* a contract provision is ambiguous also is a question of law for the court to decide. *Video Zone, Inc. v. KF & F Properties, L.C.*, 594 S.E.2d 921, 923 (Va. 2004); *Musselman*, 533 S.E.2d at 921. A contract term is not ambiguous merely because the parties disagree as to the term's meaning. *Ross v. Craw*, 343 S.E.2d 312, 316 (Va. 1986); *Doswell Ltd. P'ship v. Virginia Elec. & Power Co.*, 468 S.E.2d 84, 88 (Va. 1996). When the terms in a contract are clear and unambiguous, the contract is construed according to its ordinary and plain meaning. *PMA Capital Ins. Co. v. US Airways, Inc.*, 626 S.E.2d 369, 372 (Va. 2006); *D.C. McClain, Inc. v. Arlington County*, 452 S.E.2d 659, 662 (Va. 1995). A contract is ambiguous if its language " 'admits of being understood in more than one way' " or " 'is of doubtful import.' " *Westmoreland-LG&E Partners v. Virginia Elec. and Power Co.*, 486 S.E.2d 289, 294-95 (Va. 1997) (quoting *Allen v. Green*, 331 S.E.2d 472, 475 (Va. 1985) and *Renner Plumbing, Heating & Air Conditioning, Inc. v. Renner*, 303 S.E.2d 894, 898 (Va. 1983)).

The Court finds that, in the abstract, a reference to a radio station's "programming format" may be understood in more than way. This is true not only among lay people, but among

19

experts within the industry. Based on each of their long and distinguished periods of experience in the industry, the Court finds that Shaw, Burns, Sabo, and Harrison are all qualified by their knowledge, education, skill, and/or experience to testify as to the meaning of the phrase in the radio industry. *See* Fed. R. Ev. 702. Their sworn statements and testimony, however, were mutually incompatible and irreconcilable. Thus a contract which purported to restrain one party from running a radio station with a "News/Talk" format, or an "Adult contemporary music" format, might very well be too ambiguous to enforce. Fortunately, that is not the issue here. The contract refers to the programming format of WNLI on the date of transfer of ownership. *Verif. Compl.* Exh. A. On that date, WNLI had a programming format known to both parties. That the experts in this case do not agree on the proper pigeonhole into which that format should be placed does not make the contract ambiguous. WNLI's format may (or may not) defy easy categorization, but it is possessed of some format which Burns is forbidden to imitate.

The phrase "substantially similar," used in reference to WNLI's format, is unambiguous. Its ordinary and plain meaning can be gleaned by resort to dictionary definitions and common usage. Similar is defined as "having characteristics in common" or "alike in substance or essentials." *Merriam-Webster's Collegiate Dictionary* (11th ed. 2004). Substantial means "being largely but not wholly that which is specified." *Id.* These definitions, and the common and ordinary meaning of the phrase, inform us that two things are substantially similar if they are largely alike or by-in-large have common characteristics.

## E. This matter is ripe for decision on the permanent injunction merits

Experts in this case were unable to agree on the definition of programming formats, or on the proper classification of the two stations at issue. But regardless of which expert's definition

20

of programming format the jury adopted, no reasonable juror could find that WLNI and WBLT do not have substantially similar programming formats.

The cardinal rule and goal in the construction of agreements is ascertainment of the intent of the contracting parties. *Worrie v. Boze*, 62 S.E.2d 876, 880 (Va. 1951). Extrinsic evidence can be admitted to explain an ambiguity in a document if the ambiguity is apparent on the face of the instrument. *Cohan v. Thurston*, 292 S.E.2d 45, 46 (Va. 1982). In construing a contract, a court must determine what the parties agreed to as evidenced by their contract. *Wilson v. Holyfield*, 313 S.E.2d 396, 398 (Va. 1984).

Although Shaw and Burns do not have identical understandings of "programming format," the contract reflects agreement to the extent that Burns' narrower definition overlaps with Shaw's broader one. Shaw distinguishes only between Talk, News/Talk, News, and Sports formats, while Burns distinguishes between All Talk, News/Talk, Full Service, Sports Talk, and Specialized Talk formats. Thus, the Court finds that Burns' understanding of "programming format"—as summarized in paragraph six of the Findings of Fact—embodies the extent of the parties' meeting of the minds. Because WLNI as of February 28, 2005, had an All Talk programming format, and Burns instituted either an identical All Talk or a substantially similar Specialized Talk format on WBLT, Burns violated the terms of non-compete agreement.

A permanent injunction is an appropriate remedy "where (i) there is no adequate remedy at law, (ii) the balance of the equities favors the moving party, and (iii) the public interest is served." *Safeway Inc. v. CESC Plaza Ltd. Partnership*, 261 F. Supp. 2d 439, 467 (E.D. Va. 2003) (quoting *Nat'l Org. for Women v. Operation Rescue*, 914 F.2d 582, 585 (4th Cir.1990)) (concluding that State law governs issuance of permanent injunctions, and collecting Virginia

21

cases demonstrating that this 3-part test used by the Fourth Circuit accords with Virginia law).

Permanent injunctive relief is appropriate in this case. Because it is impracticable or impossible for Centennial to measure the damages caused by violation of the non-compete agreement, it has no adequate remedy at law. The balance of the equities favors Centennial because it compensated Burns handsomely for the goodwill associated with WLNI; negotiated in good faith a non-compete agreement that is reasonable in geographic scope and duration and targeted only to prohibit Burns from directly competing with WLNI; and because Burns blatantly violated the agreement within a year of its inception. The public interest is served by the legal system's swift and clear enforcement of a fair and freely made contract.

## V. Conclusion[17]

Centennial has no adequate remedy at law for Defendants' breach of the non-compete agreement; the equities of this case balance in its favor; and the public interest will be served by the granting of a permanent injunction in this matter. Accordingly, it is this day ORDERED that Defendant Gary Burns is PERMANENTLY ENJOINED from participating in or being in any manner connected with the ownership, operation, management or control of any commercial AM or FM broadcast business at any broadcasting station that is included in the Roanoke-Lynchburg Arbitron Metro radio market for a period of five years[18] if that business station uses the following

---

[17] As noted in the Court's June 8, 2006 Opinion (docket no. 41) denying Defendants' motion to dissolve, it will not address Defendants First Amendment Arguments, which were not raised at the preliminary injunction stage, and, in any event, are wholly specious in the absence of the crucial element of state action.

[18] The five-year period commenced February 28, 2005; was tolled from November 1, 2005, until March 20, 2006; and re-commenced as of the date of this Memorandum Opinion. *See Non-solicitation and Consulting Agreement*, ¶7.

22

programming formats defined in footnote ten: All Talk, News/Talk, Full Service Talk, or Specialized Talk with a focus on current events and/or politics. Defendant 3 Daughters Inc. is PERMANENTLY ENJOINED from the same so long as Gary Burns is directly or indirectly its licensee, principal, agent, consultant, employee, proprietor, partner, lender, shareholder,[19] director, or officer.

The Clerk of the Court is directed to send certified copies of this Opinion and Order to all Counsel of Record.

ENTERED: _____
U.S. District Judge

_____
Date  Sept. 29, 2006

---

[19] Unless 3 Daughters Inc. becomes publicly traded and Burns owns less than five percent of outstanding shares.

23